**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

JAMES ELTON ROBERTS,

        Plaintiff,

v.                                      Case No. 3:23-cv-1133-WWB-SJH

THOMAS ALLEN, et al.,

        Defendants.

_____/

## <u>ORDER</u>

THIS CAUSE is before the Court on Defendants' Motion for Summary Judgment (Doc. 38) and Plaintiff's Response (Doc. 45) thereto.[1]  For the reasons set forth below, Defendants' Motion will be granted.

## I.    BACKGROUND

Plaintiff James Elton Roberts, an inmate of the Florida Department of Corrections ("**FDC**"), is proceeding pro se on a Complaint for Violation of Civil Rights ("**Complaint**") against six Defendants in their individual capacities: Sergeant Thomas Allen, Sergeant Edward Duncan, Sergeant Vincent Gaetano, Lieutenant Ronnie Weems, Sergeant Erick Prock, and Sergeant Tyrell Reagor.  (Doc. 1).  Based on a forced cell extraction that occurred at Florida State Prison on November 16, 2021, Plaintiff raises claims of excessive use of force against Defendants Allen, Duncan, Gaetano, Prock, and Reagor

---

[1] The Court previously advised Plaintiff of the provisions of Federal Rule of Civil Procedure 56, notified him that the granting of a motion for summary judgment could prevent any future litigation of the claims, and gave him an opportunity to respond to the present Motion.  (*See* Doc. Nos. 5, 44).

(collectively, the "**UOF team**"), and a claim of failure to intervene in the use of force against Defendant Weems. (*Id.* at 3–5). Plaintiff alleges that although he agreed to come out of his cell after being stripped "butt naked for [a] strip search," the UOF team entered the cell, pushed him into a corner, slammed his head against a wall, and repeatedly struck him in the face, head, neck, and ribs, while he was handcuffed and not resisting. (*Id.* at 4–5). Plaintiff alleges that "Weems egged [the UOF team] on and just watched this happen." (*Id.*). As a result, Plaintiff's "face and head swelled so bad" that x-rays of the head were taken, he was "split [in] multiple places" on his left eye and lost vision in that eye,[2] and his ribs were broken, making it painful to breathe "for a few months," but he was refused x-rays. (*Id.* at 5). Plaintiff seeks actual and punitive damages for his injuries. (*Id.*).

Defendants move for summary judgment on all claims and argue: (1) Plaintiff cannot prove his claims of excessive use of force and failure to intervene; (2) Defendants are entitled to qualified immunity; (3) Plaintiff fails to allege more than a de minimis injury to the extent he alleges only bruising or minor abrasions as a basis for his compensatory damages; and (4) Plaintiff cannot recover punitive damages. (Doc. 38). Plaintiff responds that the Court should deny Defendants' Motion and allow Plaintiff to proceed to trial. (*See* Doc. 45 at 2). Without providing any evidentiary support, Plaintiff argues that "numerous documents by medical professionals" and video footage support his claims. (*Id.*).

---

[2] The optometrist at the facility diagnosed Plaintiff with traumatic neuropathy and referred him to an outside provider, but because someone "kept deleting" the notes, Plaintiff was not seen by Envision Ocala until a year later. (Doc. 1 at 5).

## II.    LEGAL STANDARD

Summary judgment is appropriate when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it may "affect the outcome of the suit under the governing law."  *Id.*  "The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1313–14 (11th Cir. 2007).  Stated differently, the moving party discharges its burden by showing "that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

However, once the moving party has discharged its burden, "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by [his or] her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (quotation omitted).  The nonmoving party may not rely solely on "conclusory allegations without specific supporting facts."  *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).  Nevertheless, "[i]f there is a conflict between the parties' allegations or evidence, the [nonmoving] party's evidence is presumed to be true[,] and all reasonable inferences must be drawn in the [nonmoving] party's favor."  *Allen*, 495 F.3d at 1314.

"If a party . . . fails to properly address another party's assertion of fact . . . [,] the court may . . . consider the fact undisputed for purposes of the motion."  Fed. R. Civ. P.

56(e)(2).  However, "the district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion."  *United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Mia., Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004).  "At the least, the district court must review all of the evidentiary materials submitted in support of the motion for summary judgment," and "must ensure that the motion itself is supported by evidentiary materials."  *Id.* at 1101–02.  However, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is  upon  the  parties  to  formulate  arguments."   *See Resolution Tr. Corp. v. Dunmar*, 43 F.3d 587,  599 (11th Cir. 1995) (citation  omitted).

"When  opposing  parties  tell  two  different  stories,  one  of  which  is  blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).  In cases involving video evidence, the "Court will accept the video's depiction over [a party's] account of the facts if the video obviously contradicts [that party's] version of the facts."  *Logan v. Smith*, 439 F. App'x 798, 800 (11th Cir. 2011) (citations omitted); *see also Charles v. Johnson*, 18 F.4th 686, 692 n.1 (11th Cir. 2021) ("Where video evidence is conclusive, witness testimony cannot be used to introduce a factual dispute."); *Singletary v. Vargas*, 804 F.3d 1174, 1183 (11th Cir. 2015) ("[W]hen the non-movant's assertion is 'so utterly discredited' by the record, no 'genuine' dispute of material fact exists sufficient to prompt an inference on behalf of the non-movant.").  "But where the recording does not clearly depict an event or action, and

there is evidence going both ways on it, we take the [non-movant's] version of what happened." *Shaw v. City of Selma*, 884 F.3d 1093, 1097 n.1 (11th Cir. 2018).

## III.   DEFENDANTS' EVIDENCE

Defendants submit the following evidence in support of their Motion: two handheld videos, titled "standing order" (Doc. 38-1) and "forced cell extraction" (Doc. 38-2), respectively; incident reports by Defendants Allen, Prock, Reagor, Duncan, and Gaetano, and by non-parties Captain Brandon Woods, Sergeant Franky Cortez, Officer James Hester, and Officer Kerry Gilbreath (Doc. 38-3); Plaintiff's record of sentences (Doc. 38-4); Plaintiff's deposition transcript and acknowledgement form (Doc. Nos. 38-5, 38-6); Plaintiff's disciplinary report and supporting documents (Doc. 38-7); the Declaration of Registered Nurse Kellie Caswell, a legal nurse consultant with FDC, and supporting medical records (Doc. 38-8); Plaintiff's verdict, judgment, and sentences from Bradford County state court case No. 2022-CF-433 (Doc. 38-9); Plaintiff's inmate request form, dated November 22, 2021 (Doc. 38-10); Plaintiff's disciplinary actions (Doc. 38-11); and the Declarations of Defendants Weems, Gaetano, and Prock (Doc. Nos. 38-13, 38-14, 38-15).[3]

In his Declaration, Defendant Weems describes the pertinent events as follows:

On November 16, 2021, I worked in E-dormitory at Florida State Prison . . . [where Plaintiff] was a close management inmate at the time . . . .

In the afternoon that day, around 2:27 PM, [Plaintiff] was causing a disturbance on the wing by shouting and banging on his door.  I confirmed that he had no medical indicators that would indicate [the] use of chemical

---

[3] In addition, Defendants submit a copy of the Court's decision in *Buckman v. Morris*, Case No. 3:13-cv-872-J-32JRK (M.D. Fla. Sept. 8, 2016), *aff'd*, 736 F. App'x 852 (11th Cir. 2018).  (*See* Doc. 38-12).

agents would be a danger to [him] and organized two officers for a chemical use of force.

I escorted a nurse to counsel [Plaintiff]. After counseling, [Plaintiff] adjusted his behavior, and the encounter terminated.[4]

Later that day, around 4:50 PM, [Plaintiff] continued his disruptive behavior by refusing to release the door flap so that it could be secured.

He temporarily complied, long enough to apply restraints to one hand, then ceased complying.

I organized two officers for a chemical use of force and a handheld camera operator, and ordered a shield be used due to [Plaintiff's] possession of handcuffs, which could be used as a weapon.

I escorted the officers to [Plaintiff's] cell and opened the cell door, while one officer held the shield and the other attempted to administer chemical agents.

During the administration of chemical agents, I observed [Plaintiff] throwing feces, hitting the shield with feces, and reaching his arm out below the shield to strike . . . Officer Hester [who was] deploying chemical agents in the face with feces.[5]

I ordered the officers to go get assessed by medical due to the battery with bodily fluids and left the cell front.

I returned with a second set of officers in protective gear.

During this second attempt to administer chemical agents[,] I observed [Plaintiff] throw feces towards me and the officer deploying chemical agents. The feces struck my leg and struck Officer Cortez[6] in the arm and leg.

---

[4] The "standing order" handheld video capturing the events between 2:26 p.m. and 2:32 p.m. on that day, supports Defendant's averments. (*See* Doc. 38-1).

[5] Hester's incident report indicates that he administered three one-second bursts of chemical agents through the chain-breached cell door, striking the state-issued mattress, linens, and clothing that Plaintiff was using to block the chemical agents, and Plaintiff was using a Styrofoam cup to throw feces, striking Hester in the face and upper torso. (Doc. 38-3 at 1). As a result, Hester was relieved of his duties by Defendant Allen who also utilized chemical agents but was still unable gain Plaintiff's compliance. (*Id.* at 1, 3). As such, Defendant Weems brought the UOF team to restrain Plaintiff. (*Id.* at 1).

[6] It appears Cortez participated only in the first administration of chemical agents at 4:50 p.m. (Doc. 38-3 at 12; *see also* Doc. 38-2).

I left [Plaintiff's] cell front with the officers to contact the duty Warden and advise him of the situation.

I returned again with officers in protective gear to attempt to administer a third and final chemical agent. I assisted in controlling the door so that only a small gap opened.

According to Florida State Prison Policy, inmates must promptly receive a shower after the use of chemical agents.[7]

I organized a cell extraction team in the event [Plaintiff's] noncooperation continued.

I gave [Plaintiff] a final order twice, instructing him to comply with strip procedures.

[Plaintiff] failed to comply by refusing to put down the cup of feces he was using to batter officers and failing to comply with every step of strip search procedures.[8]

I ordered the cell extraction team to use only the force necessary to restrain [Plaintiff].

Upon the cell door being opened, the cell extraction team attempted to enter [Plaintiff's] cell. I observed [Plaintiff] lunge towards the officers and push against the cell extraction team, preventing them from entering.

The cell extraction team ultimately overcame [Plaintiff's] resistance and used techniques designed to subdue physical resistance to apply arm and leg restraints.

Due to the size of the cell and the number of people now in the cell, I did not have a clear view of the entire use of force. However, I could see enough to know that the officers did not use excessive force or violate [Plaintiff's] rights.

---

[7] Due to Plaintiff's refusal to comply with orders, he did not receive a decontamination showed within twenty minutes of the application of chemical agents. (*See* Doc. 38-3 at 2).

[8] Defendant Weems clarified in one of the incident reports that "following [his] final order, prior to the forced cell extraction, [Plaintiff] complied with strip search procedures but then bent down, picked up a Styrofoam cup and refused to drop it." (Doc. 38-3 at 2).

From what I could hear, upon entry to the cell, the officers lifted [Plaintiff] onto the bunk and struggled with him to apply restraints.

After a short time, the officers were able to apply arm and leg restraints, and assisted [Plaintiff] to his feet to be escorted out of the cell.

Once restraints were applied all force ceased.

I did not witness, nor do I have any reason to believe that a member of the cell extraction team used excessive force or assaulted [Plaintiff].  I would never allow an officer to do so in my presence.  Had I observed an officer using excessive force, I would have intervened.

(Doc. 38-13 (numbering omitted)).

In their respective Declarations, Defendants Gaetano and Prock describe their participation in the events as follows.  Defendant Gaetano avers:

On November 16, 2021, I was assigned as the H-Wing Housing Supervisor at Florida State Prison.

I was present in E-dormitory due to an organized chemical use of force on [Plaintiff].

I held the shield while Sergeant Allen administered three one-second bursts of chemical agents into [Plaintiff's] cell, and observed [Plaintiff] block the application of chemical agents using his state-issued mattress, linens, and clothing.

I left the cell to dress out in protective gear and assist in forced cell extraction as cell extraction team member #5.

I was initially unable to enter the cell due to [Plaintiff] pushing against the shield.

When I was able to enter the cell, I saw [Plaintiff] was restrained in a prone position against the cell bunk.

I grasped [Plaintiff's] right leg and applied restraints.

Other officers rolled [Plaintiff] onto his back, and I applied the leg restraints to his left leg.

Once restraints were applied [Plaintiff] ceased his combative behavior and all force ceased.

I did not witness, nor do I have any reason to believe that a member of the cell extraction team used excessive force or assaulted [Plaintiff]. I would never allow an officer to do so in my presence. Had I observed an officer using excessive force, I would have intervened.

(Doc. 38-14 (numbering omitted)).

Defendant Prock avers as follows:

On November 16, 2021, I was assigned as the forced cell extraction team member #1. I held the shield when the door was opened.

As I attempted to enter [Plaintiff's] cell, he charged the door, and I used the shield to push him back from the entrance and prevent him from exiting the cell.[9]

I was initially unable to enter the cell due to [Plaintiff] pushing against the shield.

When I was able to enter the cell, I saw [Plaintiff] drop to his knees. I saw Sergeant Reagor grasp [Plaintiff's] torso. Then, [Plaintiff] stood and attempted to turn away from Sergeant Reagor to break his grip. I used the shield to help push [Plaintiff] onto the cell bunk.

While falling to the bunk, I saw [Plaintiff] hit his facial area on the edge of the cell bunk.

I put the shield on the floor, then grabbed [Plaintiff's] right elbow to assist the other members of the cell extraction team [to] roll [Plaintiff] onto his back on the cell bunk.

I held [Plaintiff] down on the cell bunk by applying pressure to his chest while the other officers applied hand and leg restraints.

Once restraints were applied[,] [Plaintiff] ceased his combative behavior[,] and all force ceased.

I did not witness, nor do I have any reason to believe that a member of the cell extraction team used excessive force or assaulted [Plaintiff]. I would never allow an officer to do so in my presence. Had I observed an officer using excessive force, I would have intervened.

---

[9] According to Defendant Prock's incident report, he "utilized the concave of the protective shield to strike [Plaintiff] in the upper torso and facial area, preventing him from exiting the cell." (Doc. 38-3 at 5).

(Doc. 38-15 (numbering omitted)).

The information in the incident reports supports Defendants' averments.[10]   For

example, Defendant Reagor's incident report states in pertinent part:

> After a brief struggle, I was able to enter the cell and [Plaintiff] dropped his body weight to his knees.  I grasped [Plaintiff's] upper torso with both of my hands and [Plaintiff] then began to stand up.  As he stood up and attempted to turn away from me, Sergeant Prock forced him to the cell bunk, breaking my grasp of [Plaintiff's] upper torso.  I positioned myself near [Plaintiff's] upper torso, at the rear of the cell and utilized both of my hands to attempt to pull [Plaintiff's] left arm from underneath his body.  Due to [Plaintiff] interlocking his hands under his body, I was initially unable to control his left arm.  Other team members then rolled [Plaintiff] over into a supine position. I repositioned my grasp and grasped [Plaintiff's] left forearm with both of my hands.  Once Sergeant Thomas Allen applied hand restraints, [Plaintiff] ceased his combative behavior[,] and all force ceased.

(Doc. 38-3 at 7–8).  Similarly, Defendant Allen's incident report provides:

> After a brief struggle, I was able to enter the cell, where other team members forced [Plaintiff] onto the cell bunk in a prone position.  I positioned myself on the cell bunk, at the rear of the cell and utilized both of my hands to pull [Plaintiff's] right arm, attempting to pull it from underneath his body.  Due to [Plaintiff] interlocking his hands under his body, I was initially unable to control his right arm.  Other team members then rolled [Plaintiff] over into a supine position.  I repositioned my grasp to [Plaintiff's] right forearm.  Once Sergeant Tyrell Reagor was able to control [Plaintiff's] left arm, I released my grasp and applied hand restraints to him.  Once hand restraints were applied, [Plaintiff] ceased his combative behavior[,] and all force ceased.

(*Id.* at 3–4).  In addition, Defendant Duncan's incident report states:

> After a brief struggle, I was able to enter the cell, where [Plaintiff] was on the cell bunk, in a prone position.  I grasped [Plaintiff's] left leg with both of my hands and controlled it as Sergeant Vincent Gaetano applied leg restraints.  Once leg restraints were applied, other team members rolled [Plaintiff] over into a supine position.  As he was rolled over, I released my grasp of his left leg and grasped his right leg with both of my hands.  I maintained my grasp until hand restraints were applied.  Once hand

---

[10] To the extent some of the incident reports do not address the cell extraction or provide necessary context, the Court does not discuss them separately.  (*See* Doc. 38-3 at 5–6, 12–15).

restraints were applied, [Plaintiff] ceased his combative behavior[,] and all force ceased.

(*Id.* at 9).  Further, Defendant Gaetano's incident report states:

After a brief struggle, I was able to enter the cell, where [Plaintiff] was on the cell bunk, in a prone position.  I grasped [Plaintiff's] right leg with my left hand [and] applied leg restraints.  Once leg restraints were applied, other team members rolled [Plaintiff] over into a supine position.  As he was rolled over, I released my grasp of his right leg and grasped his left leg with both of my hands.  Once hand restraints were applied, [Plaintiff] ceased his combative behavior[,] and all force ceased.

(*Id.* at 10–11).

The "forced cell extraction" video also supports Defendants' statements.  (*See generally* Doc. 38-2).  According to the video, after Plaintiff refused to cease his disruptive behavior, Defendant Weems ordered three uses of chemical agents, with three bursts each, at the entrance of Plaintiff's cell.  (*Id.*).  The first use was administered by non-parties Cortez and Hester at approximately 4:51 p.m.; and the second and third uses were administered by Defendants Allen and Gaetano at approximately 5:02 p.m. and 5:10 p.m. (*Id.*; *see also* Doc. 38-3 at 1–3, 10, 12).  During the administration of chemical agents, Plaintiff can be seen throwing feces at the officers, smearing their shield and the door of his cell.  (Doc. 38-2).  Then, at around 5:24 p.m., Defendant Weems directs the UOF team (Prock #1, Reagor #2, Allen #3, Duncan #4, and Gaetano #5) to line up at Plaintiff's door for a cell extraction.  (*Id.*; *see also* Doc. 38-3 at 1, 3, 5, 7, 9–10).  At 36:14 minutes into the video, the officers open the door and manage overcome Plaintiff's resistance about twenty seconds later at 36:35 minutes.  (Doc. 38-2).

As the five officers enter the cell, three of them are standing near the door, for the most part blocking the camera's view.  (*Id.*).  Throughout the extraction, Defendant Weems remains outside the door, observing and giving commands to the officers, and

attempting to gain Plaintiff's compliance through verbal commands. (*Id.*). At 36–37 minutes into the video, Defendant Weems and other officers can be heard repeatedly telling Plaintiff to "put it down," "put the cup down," "watch out" for the shield, "put up [his] hands," or "give [his] hands." (*Id.*). The video shows an organized, orderly scene that is sufficiently quiet, allowing the Court to hear the clicking of the restraints inside the cell. (*Id.*). The officers apply the first restraint at 36:53 minutes. (*Id.*). The Court cannot see or hear anything indicative of kicking or punching, and all officers in view appear calm and professional. (*Id.*). At 38:49 minutes, the officers move the shield outside the cell. (*Id.*). At 39:34 minutes, Defendant Weems reports to the camera that Plaintiff is fully restrained. (*Id.*).

Then, the officers help Plaintiff get dressed and start escorting him from the cell to the shower at 41:12 minutes. (*Id.*). Plaintiff's face is initially uncovered and appears bruised, red, and/or bloody. (*Id.*). As they walk toward the shower, an officer announces the time is 5:29 p.m. (*Id.*). At 5:32 p.m., while Plaintiff is in the shower, the scene is still orderly without any visible or audible complaints or concerns. (*Id.*). At 5:36 p.m., the officers provide new boxers to Plaintiff and escort him to the medical unit at 5:38 p.m. (*Id.*). Plaintiff is wearing boxers, a single shoe, and a spit shield on his face. (*Id.*). At 5:41 p.m., the medical assessment begins behind closed doors. (*Id.*). The camera records the examination through the door window. (*Id.*). The medical staff take Plaintiff's vital signs, document his injuries, and clean up his facial wounds. (*Id.*). When a female nurse examines Plaintiff's left eye, he appears to cringe, but there are no other visible or audible signs of distress or difficulty breathing during the eight-minute examination. (*Id.*).

Plaintiff leaves the examination room with the spit shield on his face, and is escorted to a different cell where he is secured at 5:55 p.m.  (*Id.*).

Defendants also submit the transcript of Plaintiff's deposition where he admitted that on the day of the incident, he "ran the team," he was "bucking the flap,"[11] and he initially ignored Defendant Weems.  (Doc. 38-5 at 20:7, 21:4, 24:23–24:24, 28:10, 62:23–63:1).  Plaintiff also admitted he had a knife "in a little hiding spot."  (*Id.* at 32:23–32:25; *but see id.* at 53:24 ("I didn't have a weapon[.]")).  In describing the administration of chemical agents, Plaintiff initially stated that he did not remember using anything to block the chemical agents, but later admitted that he "really did block the gas."  (*See id.* at 59:12–59:25 ("They said I had two things in my hand blocking the gas, but I'm throwing [feces] out at them at the same time.  I don't know how . . . I did that."), 60:14–60:15 ("I stuck my knee through the door.  And I was blocking the gas with my leg.")).  Several times during the deposition, Plaintiff admitted he "threw [feces] out the door."  (*Id.* at 20:19, 38:2, 59:20; *but see id.* at 42:1–42:11 ("I would never admit to it if I did.  But no.  And they can't prove it.")).  He also admitted he physically resisted the UOF team despite their commands to drop the cup, show his hands, and stop resisting.  (*Id.* at 21:24–23:18, 32:9–32:12).  Plaintiff described the cell extraction as follows:

> [Reagor saw] that I'm using one slit and one hand to hold the entire team up.  He hits me in the ribs.  I just look at him.  Because I'm kind of hard body.  I don't look back.  He looks back down.  He snatches my foot out from under me.  Then when he snatched the foot out from me, they pushed me over into the corner and off on the f****** locker lid.  They're over there beating the s*** out of me on the locker lid, curling me up.  Stop resisting, inmate.  Stop resisting.  . . .

---

[11] The "flap" is the food portal on the cell door.  (*See* Doc. 38-5 at 28:12–28:23 (stating that "if you buck those flaps, when they open the flap[,] you stick your arm out so they can't close it")).  Plaintiff testified he was "bucking the flap" to draw attention to the fact that he was being starved.  (*Id.* at 63:5).

Then they f****** pushed me over to the side.  They . . . dog pile me onto the bunk.  . . .  So smart individual that I am, because I've been through a lot of things in prison, I know the way they've got me positioned, if I start rolling, it'll f*** my ribs up.

So they're hitting on me . . . .  [A]t first I put my hand . . . , my guard up.  And then, they're telling me, stop resisting, stop resisting.  . . .  And now, give me your f****** hands . . . .  I give them my hands, and then they keep f****** hitting me . . . .

Then[,] . . . one of them, . . . I believe that was Reagor[,] reached down and grabbed some shit.  . . .  I had a split on my face, and rubbed the shit on my face on the cut, okay?  And I get up and I go to the shower.

(*Id.* at 22:3–23:9).   Plaintiff also testified that he was handcuffed when the officers continued beating him and rubbing feces "in the splits on [his] face."  (*Id.* at 51:1–51:5, 52:20–52:21).  In addition, he testified that they choked him in the shower.  (*Id.* at 53:8; *see also id.* at 26:14 ("Allen started choking me.")).  According to Plaintiff's testimony, he had over one hundred uses of force in this institution.  (*Id.* at 52:5–52:6).

Plaintiff's disciplinary report shows a long list of disciplinary violations both before and after the present incident, including possession of weapons, battery on inmates, disorderly conduct, and disobeying orders.  (Doc. 38-11).  After the present incident, Plaintiff received three disciplinary reports for battery or attempted battery on Defendant Weems, and non-parties Hester and Cortez.  (*See* Doc. 38-7).  Plaintiff pleaded no contest, was adjudicated guilty, and was sentenced to sixty days of disciplinary confinement.  (*Id.*).  In addition, Plaintiff was charged with three counts of battery by throwing or expelling bodily fluids in Bradford County state court case No. 22-CF-433; was convicted by a jury on February 21, 2023; and was sentenced to three five-year terms of imprisonment to run consecutive to his active sentences.  (*See* Doc. Nos. 38-4, 38-9).

14

With respect to Plaintiff's injuries, Defendants submit Ms. Caswell's Declaration where she avers:

5. According to his medical records, [Plaintiff] was seen by medical personnel following the [use of force] on November 16, 2021.

6. He arrived at medical ambulatory, alert, and oriented to person, place, time, and situation, was able to move all extremities without difficulty. His gait was unaltered, respirations even and unlabored, and he responded to questions verbally. His vital signs were within normal limits, except for a slightly elevated blood pressure. Exh. A – Emergency Room Record [Doc. 38-8 at 7].

7. During the medical exam, [Plaintiff] stated, "I'm good" and denied pain. *Id.*

8. The following injuries were documented:
    a. Multiple superficial abrasions to the back;
    b. Right eyelid laceration 1 cm, no depth, no width;
    c. Right eyelid laceration 1 cm, no depth, no width;
    d. Right cheek three lacerations 0.5 cm, no depth, no width;
    e. Hematoma behind right ear;
    f. Bridge of nose laceration 1 cm;
    g. Left eyebrow two lacerations 0.5 cm, no depth, no width;
    h. Left eye hematoma/[edema/]eye closed;
    i. Left collarbone hematoma at base of neck.

    Exh. B – Diagram of Injury [Doc. 38-8 at 8].

9. An x-ray of his facial bones and skull was completed on November 22, 2021, and the results demonstrated no acute osseous abnormalities. Exh. C – X-Ray Findings [Doc. 38-8 at 9–10].

10. In the records I reviewed[,] there was no evidence of broken ribs. [Plaintiff] did not complain of rib pain and his breathing was documented as normal.

11. In the records I reviewed[,] there was no evidence of sutures needed.

12. [Plaintiff's] left eye was swollen shut on the day of the assessment, which resulted in acute loss of vision in that eye due to swelling.

13. [Plaintiff] had impaired vision before the November 2021 incident.

14. He experiences dry eyes from allergies, which can cause visual disturbance, and which he indicated he has had since he was a child.  Exh. D – Inmate sick call [Doc. 38-8 at 11–15].

15. [Plaintiff's] vision was assessed on June 27, 2015, during a Periodic Screening Encounter.  The assessment documented his visual acuity of right eye 20/200, left eye 20/200.  Corrected with glasses, his visual acuity was right eye 20/25, left eye 20/25.  Exh. E – Period Screening Encounter [Doc. 38-8 at 16–17].

16. In the records I reviewed[,] there was no evidence [Plaintiff] had any other vision assessments before November 16, 2021.

17. On November 17, 2021, [Plaintiff] was seen cell-front by FDC medical staff.  Continued swelling to the left eye orbit was noted.  Composite Exh. F – Chronological Record of Health Care, p.3 [Doc. 38-8 at 18–20].

18. On November [19], 2021, [Plaintiff] was assessed by FDC medical staff and reported "he could see out of his left eye better but was still hazy."  The assessment documented bruising to both eye areas, with greater bruising on the left side.  He reported being able to see out of both eyes.  Composite Exh. F – Chronological Record of Health Care [Doc. 38-8 at 19, 41].

19. On November 30, 2021, [Plaintiff] saw optometrist Dortheanne Roberts, D.O.  His visual acuity with glasses was documented as right eye 20/30, left eye 20/400.  He reported feeling pressure in the left eye, difficulty focusing, and color vision change.  With both eyes, [Plaintiff] had 20/30 vision.  Composite Exh. G – Vision Assessment/Consultant's Report [Doc. 38-8 at 37–40, 42].

20. The optometrist gave a provisional diagnosis of traumatic optic neuropathy and referred [Plaintiff] to a retina specialist.  *Id.*

21. On December 15, 2021, [Plaintiff] had another assessment.  His visual acuity without correction was documented as right eye, 20/150, left eye 20/400, and corrected, right eye 20/30[,] left eye 20/400.  With both eyes, [Plaintiff] had 20/30 vision.  Composite Exh. G [Doc. 38-8 at 29–32].

22. On January 28, 2022, [Plaintiff] was assessed.  His visual acuity without correction was documented as right eye 20/150, left eye 20/400, and corrected, right eye 20/20, left eye 20/400.  With both eyes, [Plaintiff] had 20/20 vision.  Composite Exh. G [Doc. 38-8 at 33].

23. On April 1, 2022, [Plaintiff] was assessed.  His visual acuity without correction was documented as right eye 20/400, left eye 20/400, and

corrected, right eye 20/20, left eye 20/50.  With both eyes, [Plaintiff] had 20/20 vision.  Composite Exh. G [Doc. 38-8 at 34–35].

24. At his April 1, 2022, appointment, [Plaintiff] claimed "no vision in his left eye."  However, the assessment documented 20/50 visual acuity of his left eye.  The doctor noted the macula appeared intact.  The assessment documents possible malingering.

25. On June 20, 2022, [Plaintiff] was assessed at Envision Medical.  He stated, "he only see[s] out of the corner of [his left] eye."  Composite Exh. H – Envision Medical Record [Doc. 38-8 at 43–46].

26. His visual acuity on June 20, 2022, was documented as right eye 20/40, left eye 20/500.  The records were unclear whether the results were based on corrected or uncorrected vision.  *Id.*

27. The June 20, 2022, assessment documented suspected malingering. *Id.*

28. On August 19, 2022, [Plaintiff] saw on-site medical staff for allergies. He complained of dry and itchy eyes but denied any vision problems. Composite Exh. F [Doc. 38-8 at 21–22].

29. On November 17, 2022, [Plaintiff] was assessed.  He complained of blurry vision in his left eye.  His visual acuity corrected was documented as right eye 20/25, left eye 20/60.  With both eyes, [Plaintiff] had 20/25 vision. Composite Exh. G [Doc. 38-8 at 36].

30.  The November 17, 2022, assessment documented suspected malingering.  *Id.*

31. On March 7, 2023, [Plaintiff] was seen by Envision Medical Specialists. He denied eye pain.  His visual acuity without correction was documented as right eye 20/100, left eye 20/100.  Corrected, [Plaintiff] had 20/20 vision. Composite Exh. H – Envision Medical Record [Doc. 38-8 at 47–55].

32. At the March 7, 2023, appointment [Plaintiff] had a vision field test (VFT). The notes documented unreliable testing and commented that the defect may have been due to errors made taking the exam.  *Id.*

33. On April 6, 2023, [Plaintiff] was seen for [dry eyes and] leg pain.  He denied eye pain.  Exh. I – Non-Traumatic Joint/Extremity Protocol [Doc. 38-8 at 56–58].

34. On December 6, 2023, [Plaintiff] had an eye exam.  His visual acuity without correction was documented as right eye 20/400, left eye 20/400,

and corrected, right eye 20/20, left eye 20/20.  With both eyes, [Plaintiff] had 20/20 vision.  Composite Exh. F [Doc. 38-8 at 23–28].

35.  On April 17, 2023, Plaintiff was involved in another use of force that resulted in swelling to his left eye.  He refused medical assessment.

36.  On August 19, 2024, [Plaintiff] was seen by National Eye Care Inc.

(Doc. 38-8 at 2–6 (emphasis omitted)).

In a November 22, 2021, inmate request form, Plaintiff indicates that he experienced loss of vision and impairment of the proper hue of colors in his left eye, x-rays of the head and face were ordered, and x-rays of the ribs should have also been ordered.  (Doc. 38-10).

## IV.    DISCUSSION

The Eighth Amendment's prohibition of cruel and unusual punishment "places restraints on prison officials, who may not . . . use excessive physical force against prisoners."  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  When prison officials are accused of using excessive physical force, "the core judicial inquiry," as set out in *Whitley v. Albers*, 475 U.S. 312 (1986), is whether the "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992).  "This standard requires a prisoner to establish two elements—one subjective and one objective: the official must have both 'acted with a sufficiently culpable state of mind' (the subjective element), and the conduct must have been 'objectively harmful enough to establish a constitutional violation.'"  *Sconiers v. Lockhart*, 946 F.3d 1256, 1265 (11th Cir. 2020) (quoting *Hudson*, 503 U.S. at 8).  The objective element is "contextual and responsive to 'contemporary standards of decency.'"  *Hudson*, 503 U.S. at 8.  "When prison officials maliciously and sadistically use force to

18

cause harm, contemporary standards of decency always are violated." *Id.* at 9. The subjective element requires the courts to determine "whether force was used 'maliciously and sadistically,'" considering the following factors: "(1) 'the need for the application of force'; (2) 'the relationship between the need and the amount of force that was used'; (3) 'the extent of the injury inflicted upon the prisoner'; (4) 'the extent of the threat to the safety of staff and inmates'; and (5) 'any efforts made to temper the severity of a forceful response.'" *Sears v. Roberts*, 922 F.3d 1199, 1205 (11th Cir. 2019) (quoting *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007)). When considering these factors, the courts must "give a 'wide range of deference to prison officials acting to preserve discipline and security,' including when considering '[d]ecisions made at the scene of a disturbance.'" *Cockrell*, 510 F.3d at 1311 (citation omitted).

Not "every malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson*, 503 U.S. at 9. De minimis uses of physical force are excluded from constitutional recognition provided they are "not of a sort repugnant to the conscience of mankind." *Id.* at 9–10. "Although the extent of the injury is a relevant factor in determining the amount of force applied, it is not solely determinative of an Eighth Amendment claim." *Muhammad v. Sapp*, 494 F. App'x 953, 957 (11th Cir. 2012) (citing *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010)). "Injury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Wilkins*, 559 U.S. at 38. "A prisoner may avoid summary judgment, 'only if the evidence viewed in the light most favorable to him goes beyond a mere dispute over the reasonableness of the force used and will support a

reliable inference of wantonness in the infliction of pain.'"  *Stallworth v. Tyson*, 578 F. App'x 948, 953 (11th Cir. 2014) (quoting *Brown v. Smith*, 813 F.2d 1187, 1188 (11th Cir. 1987)).

Additionally, "[a]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable for his nonfeasance."  *Williams v. Radford*, 64 F.4th 1185, 1199 (11th Cir. 2023) (quoting *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1341 (11th Cir. 2007)).  "To be held liable, the officer must both be 'in a position to intervene' and 'fail to do so.'"  *Sebastian v. Ortiz*, 918 F.3d 1301, 1312 (11th Cir. 2019) (citation omitted).  But "an officer cannot be held liable for failing to . . . intervene when there was no constitutional violation being committed."  *Id.*

Here, affording Defendants a wide range of deference in maintaining prison security, the Court finds the five *Whitley* factors balance in Defendants' favor.  First, considering the undisputed evidence, Defendants reasonably perceived they needed to use force in the face of Plaintiff's disturbance and open defiance to their orders.  *See, e.g.*, *Cockrell*, 510 F.3d at 1311 ("The need for the use of force is established by the undisputed evidence that [the inmate] created a disturbance." (citation omitted)).  Although Plaintiff initially adjusted his behavior after a nurse counseled him, he later resumed his disruptive behavior by refusing to release the door flap and complied only long enough for restraints to be applied to one hand, necessitating the use of chemical agents.  (*See* Doc. Nos. 38-1, 38-2, 38-13).  Moreover, when verbal counseling failed again and Defendants resorted to the administration of chemical agents, Plaintiff battered the officers with his feces and used his mattress, linens, and clothing to block the chemical

agents.   (Doc. Nos. 38-2, 38-3, 38-13, 38-14).   Next, Plaintiff openly defied Defendant

Weems's final orders by refusing to fully comply with strip procedures and drop the cup

holding the feces, necessitating the use of physical force.  (Doc. Nos. 38-2, 38-3, 38-13).

Although Plaintiff alleges that he agreed to come out of his cell, the video footage shows

that he charged the door and pushed against the UOF team to prevent them from entering

his cell.  (Doc. Nos. 38-2, 38-3, 38-13, 38-14, 38-15).

Significantly, when the five officers managed to overcome Plaintiff's resistance and

enter his cell, Plaintiff, by his own admission, continued to resist their verbal commands

and attempts to restrain him.   (Doc. Nos. 38-3, 38-5, 38-13, 38-14, 38-15).   At his

deposition, Plaintiff admitted that he "ran the team" and refused to comply with the officers'

repeated commands to drop the cup, show his hands, and stop resisting.  (Doc. 38-5).

Specifically, he described the cell extraction as follows:

> [Reagor has] seen that I'm using one slit and one hand to hold the entire
> team up.  He hits me in the ribs.  I just look at him.  Because I'm kind of hard
> body.  I don't look back.  He looks back down.  He snatches my foot out
> from under me.  Then when he snatched the foot out from me, they pushed
> me over into the corner and off on the f****** locker lid.  They're over there
> beating the s*** out of me on the locker lid, curling me up.  Stop resisting,
> inmate.  Stop resisting.  . . .
>
> Then they f****** pushed me over to the side.  They . . . dog pile me onto
> the bunk.  . . .  So smart individual that I am, because I've been through a
> lot of things in prison, I know the way they've got me positioned, if I start
> rolling, it'll f*** my ribs up.
>
> So they're hitting on me . . . .  [A]t first I put my hand . . . , my guard up.  And
> then, they're telling me, stop resisting, stop resisting.  . . .  And now, give
> me your f****** hands . . . .  I give them my hands, and then they keep f******
> hitting me . . . .

(*Id.* at 22:3–23:4).  Further, according to the incident reports, Plaintiff attempted to turn

away from the officers and then interlocked his hands under his body, making it difficult

21

for the officers to apply hand restraints.  (Doc. 38-3 at 3–4, 7–15).  These additional details, which are uncontroverted, further explain why there was a struggle to restrain Plaintiff after the officers entered the cell.  Plaintiff's physical resistance and refusal to submit to restraints unnecessarily prolonged the encounter and amplified the need for force.

Second, the relationship between the need and the amount of force used also appears to weigh in Defendants' favor.  Although the video evidence does not show the individual, specific movements of Plaintiff and each Defendant inside the cell, it reveals a calm, organized, and professional effort to extract Plaintiff from the cell.  *See Santiago v. Jackson*, No. 3:22-cv-484, 2024 WL 5186877, at *12 (M.D. Fla. Dec. 20, 2024) ("Although the individual movements or actions of all five officers cannot clearly be discerned, the situation appears as calm as a cell extraction can be, and no officer can be seen making unnecessarily violent or punching-like motions."); *Gomez v. Lister*, No. 3:20-cv-253, 2022 WL 562266, at *10, *14, *17 (M.D. Fla. Feb. 23, 2022) (granting the officers' motion for summary judgment on an excessive force claim in which the plaintiff alleged that the officers punched and kicked him during a cell extraction, even though "the individual movements or actions of each officer or [p]laintiff" could not be seen on the video as multiple officers were blocking the camera's view, where the cell extraction was justified given plaintiff's behavior, it "appeared calm and professional," it was completed within minutes, and no "kicking or punching motions [were] visible"), *aff'd*, No. 22-10808, 2022 WL 16776248 (11th Cir. Nov. 8, 2022); *Buckman*, No. 3:13-cv-872-J-, at *15 ("While it is true that the video camera cannot penetrate the scrum of officers while they are trying to get Plaintiff restrained, we can see the officers following a procedure, see the situation

escalate briefly, with voices raised, and then see Plaintiff restrained and being pulled up to a standing position with blood on his face and shirt.  There are no obvious punches thrown (save the distractionary hammerfist to Plaintiff's shoulder area), kicking, or other violent movements by the officers.").  Notably, the Court cannot see or hear anything indicative of kicking or punching, and all officers in view appear calm and professional. (*See generally* Doc. 38-2).  In fact, the scene is quiet enough that the Court can hear the clicking of the restraints, as well as the officers' repeated commands to Plaintiff to put the cup down, show his hands, and stop resisting.  (*Id.*).

Although the struggle to fully restrain Plaintiff took two to three minutes from the time the officers opened the door, the undisputed evidence shows that Plaintiff was pushing against the officers for twenty seconds to prevent them from entering the cell, and then continued to actively resist them and defy their orders.  (*Id.*).  And although the UOF team consisted of five officers, the video shows that three of them were standing near the door, while the rest were trying to subdue Plaintiff.  (*Id.*).  As explained in the incident reports, Reagor and Allen were at the rear of the cell struggling to place hand restraints on Plaintiff, while Prock was preventing Plaintiff from exiting the cell.  (Doc. 38-3 at 3–4, 7–8).  Also, during his combative behavior, Plaintiff managed to interlock his hands under his body.  (*Id.* at 3–4, 7–15).  Importantly, after the officers applied hand and leg restraints on Plaintiff, they did not use any more physical force.  *See Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1356 (11th Cir. 2015) (finding no excessive force where "the officers did not apply any force after [the plaintiff] finally surrendered his hands to be cuffed," and distinguishing cases like *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002), where force was applied after "the plaintiff was already arrested and in

handcuffs").  In his deposition Plaintiff stated that the officers kept hitting him even after he showed his hands, but the video does not seem to support his version of the events. As stated earlier, the scene was orderly and quiet.  No hitting motions can be seen or heard.  No complaints, protests, or any kind of loud noises can be heard from anyone inside the cell, including Plaintiff.  After Plaintiff was restrained, the officers helped him get dressed so he could be escorted to the shower and then to the medical unit.  *See Cockrell*, 510 F.3d at 1312; *Gomez*, 2022 WL 562266, at *17.  Thus, the record does not support an inference of wantonness in the infliction of pain.  *See Scott*, 550 U.S. at 380; *Brown*, 813 F.2d at 1188 (stating that under *Whitley*, "a prison security measure undertaken to resolve a disturbance gives rise to a § 1983 claim only if the measure taken 'inflicted unnecessary and wanton pain and suffering' upon the prisoner").  As such, there is no genuine dispute about whether the officers were justified in using force or whether they used only the amount of force necessary to restrain Plaintiff.  *See Gomez*, 2022 WL 562266, at *17.

Third, the Court considers the extent of the injury inflicted on Plaintiff.  The video evidence shows that as Plaintiff was being escorted out of his cell, his face looked bruised, red, and/or bleeding; his left eye was completely shut; and he had some red spots resembling abrasions or bruises on his torso.  (Doc. 38-2).  Plaintiff's medical examination immediately after the decontamination shower indicates he was ambulatory, alert, oriented, and able to move all extremities; he responded to questions verbally; and his respirations were even and unlabored.  (Doc. 38-8 at 2, 7).  He denied pain and stated he was "good."  (*Id.*).  The following injuries were documented: multiple superficial abrasions to the back; two lacerations of 1 cm each to the right eyelid; three lacerations

of 0.5 cm each to the right cheek; hematoma behind the right ear; a laceration of 1 cm to the bridge of the nose; two lacerations of 0.5 cm each to the left eyebrow; hematoma, edema, or closed left eye; and left collarbone hematoma at the base of the neck. (*Id.* at 2, 8). There was no evidence that sutures were needed. (*Id.* at 3). There was also no evidence of broken ribs, rib pain, or difficulty breathing. (*Id.*). An x-ray of the facial bones and skull, completed on November 22, 2021, was unremarkable. (*Id.* at 3, 9–10).

At the post-use-of-force examination on November 16, 2021, Plaintiff's left eye was swollen shut. (*Id.* at 3). On November 17, 2021, Plaintiff's left eye orbit was still swollen. (*Id.* at 3, 18–20). On November 19, 2021, Plaintiff reportedly could see out of both eyes, but his left eye was hazy and more bruised. (*Id.* at 3–4, 41). On November 30, 2021, Dr. Roberts reported Plaintiff's corrected vision with both eyes was 20/30; provisionally diagnosed traumatic optic neuropathy; referred Plaintiff to a retina specialist; and noted he had pressure in the left eye, difficulty focusing, and color vision change. (*Id.* at 4, 37–40, 42). Plaintiff's corrected vision with both eyes was 20/30 on December 15, 2021, and 20/20 on January 28, 2022. (*Id.* at 4, 29–33). On April 1, 2022, his corrected vision with both eyes was 20/20, with noted possible malingering, which was again documented on June 20, 2022, by Envision Medical. (*Id.* at 4–5, 34–35, 43–46). On August 19, 2022, Plaintiff denied vision problems. (*Id.* at 5, 21–22). On November 17, 2022, he complained of blurry vision in the left eye; his corrected vision with both eyes was 20/25; and suspected malingering was noted. (*Id.* at 5, 36). On March 7, 2023, Plaintiff's vision field test by Envision Medical was deemed unreliable and his corrected vision with both eyes was 20/20. (*Id.* at 5, 47–55). On December 6, 2023, Plaintiff's corrected vision with both eyes was 20/20. (*Id.* at 6, 23–28).

Plaintiff's injuries do not necessarily indicate that Defendants used excessive force during the cell extraction.  *See Cockrell*, 510 F.3d at 1311 (finding that the injury factor was not dispositive even though "the extent of the injury was relatively extensive," where the defendant was justified in using force, he could not have foreseen that "a simple push would result in as much injury as [the inmate] unfortunately suffered," and he "immediately summoned medical assistance" for the inmate).  "A cell extraction necessarily involves force, the kind of which carries the inherent risk that an inmate or officer may sustain an injury."  *Santiago*, 2024 WL 5186877, at *12; *see also Thomas v. Bryant*, 614 F.3d 1288, 1301 n.13 (11th Cir. 2010) ("In a cell extraction, a team of five correctional officers enter an inmate's cell and *forcibly* restrain and remove him." (emphasis added))).  "[S]mall scrapes, bumps, and bruises . . . are entirely consistent with a routine takedown" for failure to comply with multiple orders.  *Charles*, 18 F.4th at 700.  Thus, Plaintiff's injuries, as listed in his medical records, do not necessarily indicate that the officers used excessive force.  Although Plaintiff alleges that his ribs were broken, making it painful to breathe "for a few months," (Doc. 1 at 5), there is no evidence of broken ribs, rib pain, or difficulty breathing.  (*See* Doc. 38-8 at 3).  Plaintiff's own testimony shows that he was unaffected by Defendant Reagor's single hit to the ribs, justifying the officers' continued efforts to overcome Plaintiff, which does not evidence malice or wantonness on their part.  (Doc. 38-5 at 22:4–23:4).  Also, while Plaintiff testified that the officers rubbed feces "in the splits on [his] face" and choked him in the shower (*id.* at 26, 51–53), there is no evidence, medical or otherwise, to substantiate such statements.

Furthermore, while Plaintiff's medical records document left eye injuries, such injuries are entirely consistent with Defendant Prock's declaration and incident report,

which state that Defendant Prock "utilized the concave of the protective shield to strike [Plaintiff] in the upper torso and facial area, preventing him from exiting the cell," "used the shield to help push [Plaintiff] onto the cell bunk," and saw Plaintiff "hit his facial area on the edge of the cell bunk" as he was falling to the bunk.  (Doc. 38-3 at 5; Doc. 38-15). Securing a combative inmate, like Plaintiff, was a reasonable, intended use of the shield. *See Oliver v. Warden*, 761 F. App'x 960, 965 (11th Cir. 2019) (holding that bending an inmate's fingers or "ramm[ing] [him] in the back with a baton during [a] cell extraction" was not "out of proportion to the legitimate need for force" where the inmate previously "threw urine and feces on a correctional officer and refused to be handcuffed," and then he "charged the officers as they opened his cell door and resisted physically the officers' efforts to restrain him").  Considering the circumstances and Plaintiff's history of fighting, battering inmates, possessing weapons, and disobeying orders, (*see* Doc. 38-11), it was not unreasonable for Defendant Prock to use the shield to prevent Plaintiff from exiting the cell and to push him to the bunk so he could be restrained.  *Buckman v. Morris*, 736 F. App'x 852, 853–54 (11th Cir. 2018) (stating that under the circumstances, including plaintiff's "history of fighting, assaulting officers, possessing weapons, and disobeying orders," "a reasonable officer would have used the shield to force an aggressive and potentially armed inmate back onto the floor so that other officers could safely restrain him").

Fourth, the Court considers the extent of the threat to the safety of staff and inmates and finds that this factor also weighs in Defendants' favor.  There is no dispute that Plaintiff initially ignored Defendant Weems and then openly defied his orders to cease the disturbance; prevented the officers from fully applying hand restraints; then battered

the officers with feces during the applications of chemical agents; used his mattress and other belongings to block the chemical agents; continued to defy the officers' orders to comply with strip procedures and to drop the cup; fought the UOF team for twenty seconds when they tried to enter his cell; and even when the officers overcame his resistance and entered the cell, he continued to ignore their verbal commands and to resist them.  Under these circumstances, which are undisputed, it was necessary for the officers to use physical force against Plaintiff.  Additionally, prior to entering the cell, the UOF team knew that Plaintiff was in possession of handcuffs and feces, and perhaps even a weapon,[12] considering the events from that day and Plaintiff's prior history of disciplinary violations.  (*See* Doc. Nos. 38-2, 38-14 (showing that Defendants Allen and Gaetano were involved in both the administration of chemical agents and the cell extraction); *see also* Doc. 38-11 (showing a long history of disciplinary violations, both before and after the date of the present incident, including violations for possession of weapons, battery on inmates, disorderly conduct, and disobeying orders)).  As such, it was reasonable for the officers to consider Plaintiff a threat to safety.

Finally, the Court considers the efforts made to temper the severity of the forceful response.  The officers made numerous attempts to gain Plaintiff's compliance before using any physical force.  They used verbal counseling by sending a nurse to Plaintiff's cell, which had only a temporary effect on his behavior.  When Plaintiff resumed his disruptive conduct and ignored Defendant Weems's orders, the officers administered three applications of chemical agents.    Rather than complying with the officers'

---

[12] At his deposition, Plaintiff testified he had a knife "in a little hiding spot," but later recanted his statement.  (See Doc. 38:5 at 32:23–32:25, 53:24).

instructions to avoid the next round of chemical agents, Plaintiff used these rounds as an opportunity to batter the officers. Under these circumstances, it was reasonable for Defendant Weems to assemble the UOF team to forcibly extract Plaintiff from his cell so he could be taken to a decontamination shower. The application of force was necessary to obtain Plaintiff's compliance. Moreover, the entire incident was videotaped and proceeded in an orderly, calm, and organized fashion.

In sum, the undisputed evidence reveals no genuine issue of material fact concerning whether Defendants' use of force was applied in a good faith effort to maintain or restore discipline. Defendant Weems ordered the cell extraction only after all other attempts to quell Plaintiff's disruptive behavior had failed. There is no evidence that the UOF team used force maliciously or sadistically. "Although [the Court] cannot pinpoint with precision the amount of force used" by Defendants, the fact that "some amount of force was justified under the circumstances," "the force was used for a legitimate security purpose," and that Plaintiff's injuries, except perhaps his left eye injury, were de minimis, persuades the Court that "the evidence in this case raises only a 'mere dispute over the reasonableness of the particular use of force' and could not support 'a reliable inference of wantonness in the infliction of pain.'" *Brown*, 813 F.2d at 1189–90 (quoting *Whitley*, 475 U.S. at 322). As explained earlier, while the "forced cell extraction" video does not show every move made by each Defendant or by Plaintiff, it sufficiently establishes Plaintiff's combative behavior that contributed to the need for force, and "obviously contradicts" Plaintiff's version of the facts. *Logan*, 439 F. App'x at 800. Thus, the evidence, even when viewed in the light most favorable to Plaintiff, does not support an inference that Defendants used force maliciously or sadistically. *Hudson*, 503 U.S. at 7.

Accordingly, the Court will grant Defendants' Motion with respect to Plaintiff's claims of excessive use of force.

Having found that Defendants' use of physical force was reasonable, Plaintiff's failure-to-intervene claim against Defendant Weems necessarily fails.  *See, e.g.*, *Mobley*, 783 F.3d at 1357 (granting summary judgment on a failure-to-intervene claim when no excessive force was used, because "a police officer has no duty to intervene in another officer's use of force when that use of force is not excessive"); *Crenshaw v. Lister*, 556 F.3d 1283, 1293–94 (11th Cir. 2009) (finding that a failure-to-intervene claim cannot stand if no excessive force was used).  Accordingly, the Court will also grant Defendants' Motion with respect to Plaintiff's claim of failure to intervene.  In light of this conclusion, the Court need not address Defendants' remaining arguments.

**V.    CONCLUSION**

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendants' Motion for Summary Judgment (Doc. 38) is **GRANTED**.

2. The Clerk shall enter judgment in favor of Defendants and against Plaintiff, terminate any pending motions, and close the file.

**DONE AND ORDERED** in Jacksonville, Florida on May 21, 2025.

_____
WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Jax-11 5/15

c:    James Elton Roberts, #132873
      Counsel of Record